CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

March 31, 2025

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ANDRE CURTIS WILKINS, ) | |
|     Plaintiff, ) | Civil Action No. 7:24-cv-00093 |
| ) | |
| v. ) | |
| ) | By: Elizabeth K. Dillon |
| INVESTIGATOR K. RASNAKE, *et al.*, ) |     Chief United States District Judge |
|     Defendants. ) | |

**MEMORANDUM OPINION**

Plaintiff Andre Curtis Wilkins, a Virginia prisoner acting *pro se*, brought a 42 U.S.C. § 1983 lawsuit alleging violations of his constitutional rights that arose when he was incarcerated at Keen Mountain Correctional Center. (Compl., Dkt. No. 1.) Before the court are motions to dismiss filed by defendants Deborah Ball, R. Harmon[1] and Whited (Dkt. No. 28) and by defendants Coleman, M. Cordle, Dowdy, C. Dye, Israel D. Hamilton, and K. Rasnake (Dkt. No. 50). Wilkins has responded to the motions. (Dkt. Nos. 46, 55.) The motion by defendants Ball, Harmon, and Whited will be granted, and the motion by defendants Coleman, Cordle, Dowdy, Dye, Hamilton, and Rasnake will be granted in part and denied in part.

I. BACKGROUND[2]

**A. Incident on July 21, 2023**

Wilkins's complaint describes an incident on July 21, 2023, involving multiple gang members, where an inmate was stabbed. (Compl. ¶¶ 15–20.) During the investigation, Wilkins was removed from his cell and taken to Unit Manager C. Dye's office. Wilkins explained to

---

[1] This defendant, Rachel Harmon, was incorrectly sued as "R. Harmen". The Clerk is directed to correct the docket with the correct spelling.

[2] The court considers the following facts as true for purposes of this motion. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).

defendants K. Rasnake and C. Dye that he "was not involved in the incident" and did not want to be involved the investigation. He stated, "I was on the bottom tier the entire time, I had nothing to do with it." (*Id.* ¶¶ 21–22.) Rasnake and Dye "constantly" told Wilkins if he did not tell them what he saw or heard, then they were going to make his bruised lip and broken arm[3] looked like he was "involved" and Wilkins was going to "wear" the consequences of the stabbing incident. (*Id.* ¶ 23.)

Wilkins got frustrated and asked, "how can I wear something I didn't do and my arm and lip has nothing to do with what happened, the max pro pod camera is clear proof." (*Id.* ¶ 24.) Dye responded by saying "we don't care about the camera, if we say you did, then you did it and you gonna wear it." Rasnake agreed with Dye's comment and "repeated it with seriousness." (*Id.* ¶ 25.)

**B. Disciplinary Proceedings**

According to Wilkins, on July 28, 2023, Rasnake fabricated a disciplinary report against Wilkins, stating that Wilkins entered cell B343 to block the doorway to ensure that inmate Saunders could not get out of the cell. Wilkins was charged with aiding and abetting another to commit aggravated assault. The false disciplinary report was served by Sgt. Stell. Even though Wilkins asked for a staff advisor to assist him with a defense within 48 hours, Sgt. Stell refused to ensure that right in violation of the 861.1 operating procedure requirements. (*Id.* ¶¶ 35–37.)

Wilkins also alleges that he submitted a witness request form on July 31 and a request for video footage to prepare for his defense during the disciplinary hearing. Both forms were sealed in an envelope with hearings officer addressed on the front. (*Id.* ¶ 38.)

---

[3] Wilkins does not explain the origin of these injuries.

On August 9, 2023, a disciplinary hearing was held by defendant M. Cordle. Wilkins alleges that the following took place:

- The hearing officer, Cordle, lied and stated that he never received the request for the max pro pod camera footage, but he received the witness request form for Saunders, when both were in the same envelope.

- Wilkins forgot to sign and date the witness request due to him not having a staff advisor to assist with filling out the forms. Allegedly, Saunders refused to make a statement as well.

- The reporting officer, Rasnake, lied and said she had seen the B3 camera with plaintiff entering cell B343.

- Wilkins explained to the hearing officer that he submitted the request for the B3 pod camera along with the witness request, all in one envelope, so how do you get one and not the other?

- Wilkins repeatedly asked Cordle throughout the hearing to be fair and take the time to look at the B3 pod camera because he submitted the paperwork and the charge was falsified by Rasnake.

- Wilkins also explained that he was on the bottom tier the entire time, was not involved, and did not enter or block the doorway of cell B343, which is on the top tier.

- Wilkins argued procedural errors and due process violations. Defendant Cordle came up with excuses to justify the errors and violations that occurred. Wilkins provided citations to the Virginia DOC 861.1 operating procedure handbook.

- Cordle also cut short plaintiff's questioning on several occasions.

- Rasnake and Cordle conspired to concoct a false charge to deprive Wilkins of a fair hearing which subjected him to retaliation for not being an information for the related incident.

- Cordle found Wilkins guilty at the end of the hearing. Wilkins was upset about how Cordle violated his rights on a false charge. Once the tape recorder went off, Cordle told plaintiff, "good luck".

- Rasnake also made plaintiff's bruised lip and broken arm/wrist look like it happened during the incident by making up two confidential witness statements.

(*Id.* ¶ 39.)

On August 10, 2023, Wilkins filed a written complaint against Rasnake for the false charge. He received a response telling him to address it in disciplinary appeal. When Wilkins submitted the regular grievance, it came back as non-grievable. Wilkins appealed but did not receive a response. (*Id.* ¶ 40.)

Wilkins sent a facility request to the warden on August 14, explaining the false charge and asking if someone could look at the camera. Wilkins also explained his whereabouts. On August 15, the secretary for the warden responded explaining that Wilkins could address the issue in an appeal packet. Wilkins sent a level I appeal on August 21 to defendant Isreal Hamilton. (*Id.* ¶¶ 41–43.) On August 23, 2023, Wilkins sent a letter to the regional administrator complaining about grievances not being processed. (*Id.* ¶ 44.)

Hamilton upheld the level I appeal on September 19, 2023. Wilkins mailed his level II appeal on October 2. On October 3, Wilkins explained his issues about the false charge and his appeals to Coleman, who looked at the paperwork and told plaintiff that he would look at the camera and talk to the investigators. (*Id.* ¶¶ 45–47.) Later that day, Wilkins showed defendant Dowdy the false charge. Dowdy stated that he had seen the video footage but does not remember the details. After Wilkins asked Dowdy for help by looking at the camera again and to report the misconduct, Dowdy said "I will lose my job. Have you ever heard of retaliation? Yes, staff will retaliate, I have 15 months and 27 days until I retire, I'm not stupid, I'm not risking my job trying to help you." (*Id.* ¶ 48.)

On October 4, 2023, Wilkins submitted an emergency grievance stating that he had been in the hole for three months on a fabricated charge. He was told to submit an informal complaint and a facility request. He did what he was told and submitted an informal/written complaint on October 4. (*Id.* ¶¶ 49–50.) In response, on October 6, Unit Manager William Cole told Wilkins

that there is "nothing he can do about it." Lieutenant Fleming and Cole both stated that the pod camera evidence should be saved because it was a stabbing incident. (*Id.* ¶ 51.)

Coleman stated on October 8, 2023, that he talked to Unit Manager Cole and an investigator, but he does not remember which investigator. On October 11, Hamilton did a round in the Restorative Housing Unit (RHU) at approximately 10:15 a.m. and Wilkins told him the charge was false and the appeal was upheld. Hamilton said, "oh well, appeal it to the regional," and kept walking away. (*Id.* ¶¶ 52–53.) At around 10:44 p.m., Dowdy stated to Wilkins, "you rotting back here, aren't you?" Wilkins responded, "it feels like it, can you help me out with the camera?" Dowdy responded saying "no, I told you why." (*Id.* ¶ 54.)

On October 21, 2023, Lieutenant Fleming responded to the written complaint from October 4 stating that there was an investigation and that the findings resulted in a disciplinary offense. Fleming failed and refused to investigate plaintiff's complaint. On October 22, at approximately 8:45 p.m., Wilkins gave defendant Dowdy the regular grievance to the written complaint, with Lieutenant Fleming's response attached, to place in the grievance mailbox in the yard. Wilkins has written facility requests to the grievance office about the misconduct, but Ombudsman Harr would act like she did not receive some complaints, saying "they don't come directly to her due to the plaintiff not having access to the grievance mailbox on the yard." The regular grievance and written complaint Wilkins gave to defendant Dowdy to put in the grievance mailbox was never processed and the paperwork disappeared. (*Id.* ¶¶ 55–58.)

Wilkins has also argued these facts to the Special Investigations Unit and the investigator said he would look at the camera and if it was true, Rasnake would be held accountable. However, nothing was done. (*Id.* ¶ 59.) Wilkins asked an outside friend for help, who sent two emails to VADOC higher-ups about the misconduct. (*Id.* ¶ 60.) On November 15, 2023,

5

Wilkins was transferred back to Wallens Ridge State Prison, where he has had previous issues in general population, so he remains in the Special Housing Unit (SHU). (*Id.* ¶ 61.)

On January 2, 2024, Wilkins received his Level II appeal in the mail from the Regional Administrator, Thomas Meyer, who dismissed the charge. Wilkins remains in RHU at Wallens Ridge. (*Id.* ¶ 62.)

**C. Medical Treatment**

After the July 21, 2023 stabbing incident, when Wilkins refused to be part of defendants' investigation, he was escorted to medical by security for an x-ray. Staff continued to harass Wilkins about the stabbing and started saying he "stabbed Saunders" in a joking manner, including medical staff. (*Id.* ¶¶ 26–27.) Wilkins was in bad pain and asked to go to the hospital. He was told that he had to get an x-ray done first. This was around 2:45 p.m. (*Id.* ¶ 28.) Later that day, around 6:15 p.m., an x-ray was taken and Wilkins's arm/wrist was shown to be broken. Medical staff gave him ibuprofen medication and removed him from medical. Wilkins was thrown in the "hole" (Restorative Housing Unit), with a broken arm and under investigation, with four other inmates. (*Id.* ¶¶ 29–30.)

Wilkins constantly asked the pill call nurses if they could get him sent to the hospital "immediately" so he could get proper treatment. On July 25, 2023, he submitted an emergency grievance about his injuries and his pain and asked to go to the hospital immediately. (*Id.* ¶¶ 31–32.)[4] Defendant R. Harmon responded that Wilkins was not at immediate risk of serious personal injury or irreparable harm. "You have been evaluated by medical and are scheduled to see offsite orthopedic." (*Id.* ¶ 33.) On July 29, 2023, Wilkins expressed medical needs to the pill call nurse and asked for assistance. The nurse stated she wasn't a specialist and there is

---

[4] Wilkins filed an attachment to his complaint listing exhibits, but the exhibits were not received with the complaint and were not filed with the court.

nothing she could do about it. (*Id.* ¶ 67.) Wilkins submitted a written complaint, and the medical manager, defendant Whited, responded to "submit a sick call." (*Id.* ¶ 68.)

Wilkins was sent offsite for treatment on July 31, 2023, ten days after his arm had been broken. (*Id.* ¶ 34.) He was treated and placed in a long arm cast. (*Id.* ¶ 69.) On August 6, 2023, he submitted a written complaint because medical staff refused to provide him with a sling to hold his arm in place or plastic bags to keep the cast dry. (*Id.* ¶ 70.) Whited responded to that complaint stating he would "contact the Unit Manager," who does not provide medical care for inmates. Wilkins received no assistance from anyone on this complaint. (*Id.* ¶ 71.) He submitted a regular grievance regarding Whited's response on August 23 that was upheld. (*Id.* ¶ 72.)

Wilkins attended a follow-up orthopedic appointment on August 28, 2023. The long arm cast was removed and replaced with a short arm cast. On September 18, the short arm cast was removed, and he was placed in a splint. Medical staff did not schedule a follow-up appointment, and Wilkins was not aware of the unscheduled appointment until several weeks later. (*Id.* ¶¶ 73–75.)

On October 24, 2023, a grievance was returned to Wilkins from the Regional Administrator with no results. He also filed two other medical complaints on medical neglect where the paperwork disappeared. Wilkins claims that he kept receipts. (*Id.* ¶¶ 76–78.)

Wilkins complained to R. Harmon during a sick call on November 9, 2023, about complications with medical treatment and not keeping up with appointments. Harmon stated that she would put plaintiff on the list to see a provider. On November 14, the floor officer in RHU asked Wilkins if he wanted to see the nurse. He stated that he did, but the floor officer, Morton, said, "How do you expect to get medical help when you didn't want to help the investigators?"

7

Nurse Ball later saw plaintiff from behind his cell door and looked at his "lumped wrist." No treatment was provided, nor appointments scheduled. (*Id.* ¶¶ 79–80.)

Wilkins was transferred to Wallens Ridge State Prison, and an x-ray was taken on December 7, 2023, at his request. A follow-up orthopedic appointment was scheduled for December 18, and it was determined that Wilkins should have an MRI. Such an appointment was not scheduled when Wilkins was at Keen Mountain. (*Id.* ¶¶ 81–83.)

### D. Claims for Relief

Wilkins enumerates the following claims:

- ¶ 85: The actions of defendant Rasnake filing a false charge for refusing to be an informant resulted in more than 180 days of lockup, violating the Fourteenth Amendment. These actions also constitute the tort of intentional infliction of emotional distress

- ¶ 86: Dye's involvement with Rasnake filing a false charge was also done with evil motive and callous indifference, in violation of the Fourteenth Amendment. Dye also acted with deliberate indifference by allowing plaintiff to suffer and not doing anything about it, in violation of the Eighth Amendment.

- ¶ 87: Dowdy's refusal to help plaintiff get out of "the hole" by reviewing the camera to see if the charge was false was negligent and deliberate indifference, violating the Eighth Amendment. Plaintiff claims that that is also intentional infliction of emotional distress.

- ¶ 88: Coleman's failure to look at the camera and not reporting it, like he said he would, violates the Eighth Amendment.

- ¶ 89: Hamilton overseeing his staff's misconduct and not holding them accountable is deliberate indifference, a violation of due process, and intentional infliction of emotional distress.

- ¶ 90: M. Cordle refusing to look at evidence in support of plaintiff's claim, refusing to be an impartial decision maker, making plaintiff's paperwork disappear, and not following the rules of Operating Procedure 861.1 violated plaintiff's due process rights, deprived him of liberty, and was intentional infliction of emotional distress.

8

- ¶ 91: Harmon's actions neglecting plaintiff's medical emergency and medical needs violated plaintiff's rights under the Eighth Amendment, causing pain, suffering, and emotional distress.

- ¶ 92: Ball's failure to provide medical treatment, making plaintiff go through pain and suffering in the hole for 10 days before getting the proper treatment, and not keeping up with plaintiff's four-week follow-up is cruel and unusual punishment.

- ¶ 93: Whited's negligence towards plaintiff's complaints and medical needs is deliberate indifference in violation of the Eighth Amendment and intentional infliction of emotional distress.

Wilkins requests declaratory relief, injunctive relief, compensatory damages against each defendant, jointly and severally, and punitive damages.

## II. ANALYSIS

**A. Motion to Dismiss**

When analyzing a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the court must view all well-pleaded allegations in the light most favorable to the plaintiff. *Kashdan v. George Mason Univ.*, 70 F.4th 694, 700 (4th Cir. 2023); *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Even so, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555. A plaintiff must "plausibly suggest an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).

9

In addition, *pro se* plaintiffs are held to a "less stringent standard" than lawyers, and courts construe their pleadings liberally, no matter how "inartfully pleaded." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Nonetheless, a *pro se* complaint must still meet the "minimum threshold of plausibility" under *Twombly* and *Iqbal*.  *See Manigault v. Capital One, N.A.*, CIVIL NO. JKB-23-223, 2023 WL 3932319, at *2 (D. Md. June 8, 2023).  While *pro se* complaints "represent the work of an untutored hand requiring special judicial solicitude," district courts are not required to "conjure up questions never squarely presented to them" or to "construct full blown claims from . . . fragments."  *Beaudett v. City of Hampton*, 775 F.2d 1274, 1277–78 (4th Cir. 1985).

**B.  Deliberate Indifference—Claims Against Ball, Harmon, and Whited**

Claims under 42 U.S.C. § 1983 based on an alleged lack of or inappropriate medical treatment fall within the Eighth Amendment's prohibition against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  To prevail on such a claim a plaintiff must demonstrate "deliberate indifference to serious medical needs" of the inmate.  *Id.*

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  Deliberate indifference requires a showing that the defendants actually knew of and disregarded an excessive risk to inmate health or safety.  *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  An official acts with deliberate indifference if he had actual knowledge of the prisoner's serious medical needs and the related risks but nevertheless disregards them.  *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018). The prison official "must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable § 1983 claim. *Estelle*, 429 U.S. at 106. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* Moreover, a prisoner "is not entitled to choose his course of treatment. Disagreements over forms of treatment concern medical judgment, not the Eighth Amendment, and mere negligence in diagnosis or treatment does not state a constitutional claim." *Reeves v. Davis*, NO. 5:21-CT-3256-M, 2024 WL 4349885, at *5 (E.D.N.C. Sept. 30, 2024) (citing *Estelle* and *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999)).

Wilkins has alleged claims based on denial of medical care and medical neglect/negligence against defendants Ball, Harmon, and Whited. Because of his broken arm, Wilkins claims that he should have been transferred to a hospital immediately when he was injured on July 21, 2023. He concedes that he was taken to an orthopedist on July 31, 2023, was placed in a long arm cast, and had numerous follow-up appointments. He was also given ibuprofen for pain. According to Wilkins, Nurse Harmon explained to him multiple times that his broken arm was not emergent and that he had been scheduled to see an orthopedist offsite. However, he complains that Nurse Ball did not schedule a follow-up appointment after receiving a cast. He also disagreed with Whited's evaluations of his grievances on this issue, but Wilkins does not allege that Whited was involved in his treatment.

In a similar case, the plaintiff had a broken wrist and complained that he should have been taken to the hospital immediately. *See Browning v. Ball*, No. 7:20CV00223, 2021 WL 1215849 (W.D. Va. Mar. 31, 2021). Instead, the plaintiff saw an orthopedist ten days later.

11

Plaintiff alleged that the delay caused the bones to fuse incorrectly and required rebreaking with implantation of a plate and screws.  However, the court dismissed the complaint reasoning that the nurse "exercised her medical judgment to treat Browning's broken wrist and the resulting pain," and that within "10 days of his injury, Browning saw a specialist at an outside facility and received surgery to repair his broken wrist two days after the consultation." *Id.* at *4.  Thus, just like the court decided in *Browning*, Wilkins's disagreement with the course of treatment and the delay in seeing an outside specialist is insufficient to state a deliberate indifference claim against these defendants.

The court further notes that Wilkins's claim of negligence is insufficient to state a claim under the Eighth Amendment.  To the extent that Wilkins may be attempting to state a claim against these defendants under state law regarding his medical care, the court declines to exercise jurisdiction and those claims will be dismissed without prejudice.

Finally, Wilkins does not allege any personal involvement by either Whited or Nurse Ball pertaining to the treatment of his broken arm.  *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (stating that liability under § 1983 requires personal involvement and cannot be based on vicarious liability).  While he alleges that Nurse Ball should have made a follow-up appointment at some point after seeing the orthopedist, this is merely another disagreement with care that is insufficient to state an Eighth Amendment claim.

In response to the motion to dismiss (Dkt. No. 46), Wilkins reiterates that he was in pain for ten days after breaking his arm.  As the court has already explained, he received treatment, so these allegations are insufficient to state a deliberate indifference claim.

Accordingly, the court will grant the motion to dismiss filed by defendants Ball, Harmon, and Whited.

12

**C. Motion to Dismiss by Defendants Rasnake, Dye, Hamilton, Dowdy, Coleman, and Cordle**

**1. Due process**

To establish a violation of procedural due process, a plaintiff must satisfy three elements: (1) a constitutionally cognizable life, liberty, or property interest; (2) a deprivation of that interest caused by some form of state action; and (3) that the procedures employed were constitutionally inadequate. *Todman v. Mayor & City Council of Balt.*, 631 F. Supp. 3d 314, 327 (D. Md. 2022) (citing *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013)).

Wilkins alleges that defendants violated his due process rights in the disciplinary proceedings that resulted in Wilkins being placed in restrictive housing for several months. (Compl. ¶¶ 89, 90.) Wilkins, however, has alleged that his disciplinary conviction was overturned. (Compl. ¶ 62.) When such a proceeding ends in a favorable outcome for the inmate, that inmate cannot state a due process violation based upon the discipline. *See Sears v. Wolf*, Civil Action No. JKB-11-1071, 2011 WL 5118467, at *2 (D. Md. Oct. 24, 2011) (citing *Morisette v. Peters*, 45 F.3d 1119, 1122 (7th Cir. 1995)); *see also Wycoff v. Nichols*, 94 F.3d 1187, 1189–90 (8th Cir. 1996) (finding no liberty interest at stake where a prisoner served forty-five days in administrative segregation before disciplinary was reversed).

Wilkins also alleges that defendant Dowdy, Hamilton, and Coleman either refused to assist, investigate, or rule in his favor on his grievances, resulting in due process violations. (Compl. ¶¶ 47, 52, 54, 58, 87–89.) These allegations fail to state a claim because inmates do not have a constitutional right to access a grievance procedure; thus, an inmate "cannot bring a § 1983 claim alleging denial of a specific grievance process." *Haynie v. Clarke*, Case No. 1:23CV00016, 2024 WL 2874374, at *3 (W.D. Va. June 7, 2024) (citing *Booker*, 855 F.3d at 541).

Finally, Wilkins alleges that Dye and Rasnake violated due process by being involved ("playing a roll") with Rasnake filing a false charge against him. (Compl. ¶¶ 85, 86.) The filing of a false disciplinary report or charge generally does not state a constitutional claim. *Cole v. Holloway*, 631 F. App'x 185, 186 (4th Cir. 2016); *Allen v. Norvell*, Case No. 7:21-cv-00213, 2022 WL 4479225, at *5 (W.D. Va. Sept. 27, 2022). However, this type of claim can be viable if the charge was retaliatory. *See id.* Liberally construing Wilkins' complaint, he has plausibly alleged that Dye and Rasnake retaliated against Wilkins for his failure to cooperate with the investigation by fabricating a false disciplinary report against him. *See Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989); *see also Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) (finding that prisoner stated a claim based on false disciplinary charges against him in retaliation for cooperation with an investigation into inmate abuse); *Harper v. Rudek*, No. CIV-12-449-HE, 2013 WL 1679986, at *3 (W.D. Okla. Feb. 8, 2013) ("In some circumstances, false disciplinary charges can amount to a violation of substantive due process if the charges were brought in retaliation for the exercise of a constitutional right.") (citing *Sprouse*, 870 F.2d at 452).

For the above-stated reasons, the court will dismiss Wilkins's due process claims against only defendants Hamilton, Dowdy, Coleman, and Cordle. The due process retaliation claims against Dye and Rasnake will not be dismissed.

### 2. Eighth Amendment

Wilkins claims against the medical defendants based on deliberate indifference to his medical needs have been addressed. Liberally construing the complaint, he appears to allege conditions of confinement claims under the Eighth Amendment against the other prison officials.

The Eighth Amendment protects convicted inmates from cruel and unusual punishment and imposes an affirmative obligation on correctional officials to provide humane conditions of

confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Like any other Eighth Amendment claim, a conditions of confinement claim has an objective and a subjective component. *Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019). To satisfy the objective component, an inmate must "demonstrate that the deprivation alleged was objectively sufficiently serious." *Id.* "To be sufficiently serious, the deprivation must be extreme—meaning that it poses a serious or significant physical or emotional injury resulting from the challenged conditions, or a substantial risk of harm resulting from . . . exposure to the challenged conditions." *Id.* And to satisfy the subjective component, a plaintiff must demonstrate that defendants acted with "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. Specifically, a plaintiff must show that the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and actually drew that inference. *Id.*

Here, Wilkins has not sufficiently alleged a plausible Eighth Amendment violation regarding conditions of confinement. Placement in segregation, in and of itself, does not allege cruel and unusual punishment. *See Brown v. Banks*, Civil Action No. 3:15CV747-HEH, 2017 WL 427492, at *5 (E.D. Va. Jan. 31, 2017). Here, Wilkins spent time in segregation before his charge was overturned, but, notably, he does not describe the conditions of his confinement while he was in segregation or in "the hole," as he labels it in the complaint.

For the these reasons, Wilkins has not stated a valid Eighth Amendment claim.

**D. State Law Claims**

Liberally construing his complaint, Wilkins has also raised certain state law claims against the prison officials, including intentional infliction of emotional distress against Rasnake, Dowdy, Hamilton, and Cordle, and false imprisonment against Rasnake, Hamilton, and Cordle.

**1. Intentional infliction of emotional distress**

15

To state a claim for the tort of intentional infliction of emotional distress in Virginia, a plaintiff must prove (1) the wrongdoer's conduct was intentional or reckless, (2) the conduct was outrageous or intolerable, (3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress, and (4) the resulting emotional distress was severe. *Almy v. Grisham*, 639 S.E.2d 182, 186 (Va. 2007).

With regard to the second element, "mere tortious or even criminal conduct is insufficient." *Carter v. Collins*, Civil Action No. 7:22-cv-00025, 2024 WL 1260588, at *7 (W.D. Va. Mar. 24, 2024) (citing *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991)). The filing of a false disciplinary charge does not meet this standard. *See id.* Accordingly, the court will dismiss this state law claim.

### 2. False imprisonment

Under Virginia law, false imprisonment is defined as the restraint of a person's liberty without sufficient cause. *Zaklit v. Global Linguist Solutions, LLC*, 53 F. Supp. 3d 835, 846 (E.D. Va. 2014) (citing *Zayre of Va., Inc. v. Gowdy*, 147 S.E.2d 710, 713 (Va. 1966)). Courts have rejected inmate false imprisonment claims based on placement in a restorative housing unit. *See Johnson v. Duty*, Civil Action No. 7:21-cv-00635, 2022 WL 2397464, at *2 (W.D. Va. July 1, 2022) ("[P]laintiff, being legally incarcerated on is criminal convictions, cannot demonstrate that he has been illegally detained simply because he has been placed in a segregated unit, and such circumstances do not give rise to a false imprisonment claim."). Thus, the court will dismiss this state law claim.[5]

---

[5] The court also notes that there is not cause of action for false imprisonment under § 1983. Instead, such claims are viewed as a claim for unlawful seizure under the Fourth Amendment. Wilkins has not alleged unlawful seizure for purposes of the Fourth Amendment. *Johnson*, 2022 WL 2397464, at *2 (citing *Rogers v. Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001)).

III. CONCLUSION

The court will issue an appropriate order granting the motion to dismiss filed by defendants Ball, Harmon, and Whited, and granting in part and denying in part the motion to dismiss filed by defendants Coleman, Cordle, Dowdy, Dye, Hamilton, and Rasnake.

Entered: March 31, 2025.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
Chief United States District Judge